## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

**REALTY MORTGAGE CORPORATION**                    **CHAPTER 11**
           **Debtor**                              **CASE NO. 09-00544-NPO**

### SECOND AMENDED AND SUPPLEMENTAL
### EMERGENCY MOTION FOR AUTHORITY TO
### USE CASH COLLATERAL, AND/OR TO OBTAIN CREDIT
### AND GRANT SECURITY THEREFOR AND FOR OTHER RELIEF

COMES NOW Realty Mortgage Corporation (the "Movant" or the "Debtor") and files this

its Second Amended and Supplemental Emergency Motion for Authority to Use Cash Collateral,

and/or To Obtain Credit and Grant Security Therefor and For Other Relief (the "Motion"), and in

support thereof would respectfully show as follows, to-wit:

1.      This Chapter 11 case was initiated by the filing of a voluntary petition pursuant to

Chapter 11 of the United States Bankruptcy Code on February 17, 2009.  Movant is the Debtor in

this Chapter 11 case and is managing the assets and businesses of the Debtor and remains in control

of all assets.

2.      This Honorable Court has jurisdiction of the subject matter herein and the parties

hereto pursuant to 28 U.S.C. §§ 157 and 1334; 11 U.S.C. §§ 105, 363, 364, 541, 1107, related

statutes, related rules and various orders of reference.  This is a core proceeding.

### Background

3.      Realty Mortgage Corporation, a Mississippi corporation established in 1988, is a

multi-state mortgage firm operating with twenty (20) years of service to the real estate industry in

Mississippi and more than forty (40) states.  The Debtor specializes in traditional A paper lending.

This includes FHA, VA, state specific bond loans, FNMA and FHLMC loans. The primary customer base is middle income borrowers and first time home buyers. In 2008, the Debtor closed approximately $1.4 billion in mortgages.

4. The Debtor has operated in two primary lending sectors: wholesale and retail originations. The wholesale division solicited mortgages from small brokers nationwide, which entailed sponsored underwriting, closing, funding and shipping of the loans into the secondary market using a Debtor warehouse line of credit unavailable to small "mom and pop" type origination offices. The retail division originated mortgages directly from the public in branch offices in several states, funding loans with the same Debtor warehouse line of credit. The Debtor's home office is in Flowood, Mississippi and the largest hub branches are in Georgia, Tennessee, Texas, New Mexico and California.

5. Countrywide Warehouse Lending ("Countrywide") has been the Debtor's major correspondent lender and, prior to the bankruptcy filing, purchased loans from the Debtor under various agreements, including the following: (a) Master Repurchase Agreement dated as of March 17, 2008 (as amended and supplemented, the "Repurchase Agreement"); and (b) Loan Purchase Agreement dated January 26, 1995 (as amended and supplemented, the "Loan Purchase Agreement" and, together with the Repurchase Agreement, the "Countrywide Agreements").

6. In 2007, The Debtor downsized several areas of operation in response to the significant changes in the mortgage industry and a reduction in available mortgage products. In January 2009, The Debtor was forced to close the wholesale division, as a result of a Countrywide renegotiation suspending third party originated paper by the Debtor to increase profitability. It was during negotiations earlier this year with Countrywide regarding reorganization for solely retail originations, when the Debtor was notified that the Countrywide lending relationship was abruptly

terminated. At the time of this filing, The Debtor is no longer in operations for origination of mortgages.

7.    At the time that Countrywide terminated the "retail" line of credit it had made available to the Debtor, a significant number of loans were "in transit". Even though the loans may have technically "closed" with the borrower, additional documentation and file organization remains for the Debtor to complete before the file has been adequately and properly documented between the Debtor, Countrywide, the borrower and others. In order to allow the Debtor to orderly wind down this aspect of its business, it has initiated this Chapter 11 case to assist it in that regard. In addition, a number of creditors, lessors and other claimants have begun applying pressure on the Debtor to collect other debts (that is, other than the Countrywide indebtedness), enforcing lease terminations, landlord lien claims and otherwise causing the Debtor to devote time to things other than the winding down of its business. Accordingly, in order to assist the Debtor in the orderly winding down of its business with Countrywide, and in general, it has initiated this Chapter 11 case.

8.    In the ordinary course of business, the Debtor and Countrywide established an account that is commonly referred to as an "over/under" account (the "Over/Under Account"). At the closing of a retail transaction, the Debtor causes the loan amount to be wired out of the warehouse line of credit. When the loan actually "funds" from the investor (in this case, Countrywide), the amount of the secured claim is credited back to the warehouse line of credit, and the balance is wired into the Over/Under Account. Also in the Over/Under Account are funds for commissions, profit, and typical "escrow" items such as ad valorem taxes and related deposits. It is from this Over/Under Account that the Debtor has been funding its operations. Currently, the Over/Under Account has, on information and belief, approximately $2.6 million in it. In the next few weeks, as the Debtor's business with Countrywide winds down, an additional $675,000.00 will

be deposited into the Over/Under Account. The Debtor believes that some of the funds in the Over/Under Account constitute cash collateral of Countrywide.

9.      In 2008, at the request of Countrywide (now a wholly owned subsidiary of Bank of America), the primary warehouse line of credit lender, The Debtor moved all warehousing to the existing $65,000,000 Countrywide line. At the time of this filing, the Debtor owed approximately $25,622,250 on this warehouse line. Countrywide is fully secured with mortgages pending sale to secondary totaling $27,264,377. Each funding reduces the balance the Debtor owes, and contributes to the Debtor's operating profits. Currently, the Debtor owes approximately $14,000,000 on this warehouse line of credit and Countrywide is fully secured with mortgages pending sale to secondary totaling approximately $15,000,000.

10.     In addition to the above described debt that the Debtor owes Countrywide, it has an additional, "non-wholesale" debt. In certain instances, the Debtor may be required to repurchase loans it has originated, and which were funded by Countrywide in the event the borrower defaults, or there are other justifications to require Countrywide to require the Debtor to repurchase the loan. At the time the Debtor's market began crumbling last year, it approached all of its lenders and made arrangements to pay a certain amount per month toward existing loan losses. The amount agreed upon with Countrywide was $75,000.00 per month. and the Debtor began making monthly payments, as agreed.

However, the amount of losses that may actually occur in connection with repurchase claims is very much an unknown number and estimates of such claims are speculative in nature. In addition to utilizing cash collateral for the wind down of its business, the Debtor needs cash collateral with which to further minimize any losses that may occur in connection with this repurchase account.

11.     The Debtor previously filed its original Emergency Motion for Authority to Use Cash Collateral and for Other Relief [DK #24] (the "Original Emergency Motion"), which contained a provision providing for the "conversion" of that motion seeking use of cash collateral into a motion under 11 U.S.C. §364 to obtain credit.  At the hearing in connection with the Original Emergency Motion, the Court entered an order on February 27, 2009, granting the Debtor's request for funding under 11 U.S.C. §364 and not for the use of cash collateral [DK #27] (the "Original Funding Order"), a copy of which is attached hereto as Exhibit "A" and incorporated herein by reference.

12.     The Original Funding Order contemplates an additional, interim hearing on March 12, 2009, with respect to additional interim funding and a final hearing with respect to funding on March 23, 2009.  The Debtor has filed its First Amended and Supplemental Emergency Motion for Authority to Use Cash Collateral and/or to Obtain Credit and Grant Security Therefor and For Other Relief [DK #31] (the "First Amended Motion") seeking additional interim funding in connection with the hearing scheduled on March 12, 2009.

13.     The Debtor seeks to borrow, from Countrywide, additional funds in order to pay accrued payroll, benefits and operating expenses and to extend the Original Funding Order, the original Emergency Motion, the First Amended Motion and the budget contemplated herein for an additional three (3) weeks after March 12, 2009.  In the alternative, if Countrywide declines to provide funding to the Debtor under 11 U.S.C. §364, the Debtor seeks use of cash collateral to pay for these expenses.

### Relief Requested

14.     The Debtor is in need of the use of cash, which may include the use of cash collateral pursuant to §363 of the Bankruptcy Code, and/or borrowed funds, pursuant to § 364 of the Bankruptcy Code to continue its operations, and to conclude, for the most part, the Debtor's

liquidation and winding up of its affairs with Countrywide with respect to loans and documentation of loans that were "in transit" as of the filing of the Petition herein. This includes the payment of utility bills, ongoing lease operating expenses, payment for goods and services necessary to maintain normal operations, wages and employee-related expenses, and the other normal categories of expenses and expenditures as set forth in a budget (the "Budget"), which is attached, incorporated by reference and marked as Exhibit "B." The budgetary needs of the Debtor for the three (3) weeks of Exhibit "B" are for additional funds that are of a non-emergency basis, such as rent, payment of the fees of the United States Trustee and related matters.

15.    The Debtor will be in continuous discussions with representatives of Countrywide regarding the use of cash collateral with respect to payment of the line items outlined in the budget, and/or for the consensual funding for these expenses and costs.

16.    Debtor is unable in the ordinary course of business or otherwise, to obtain unsecured credit allowable pursuant to section 503(b)(1) of the Bankruptcy Code as an administrative expense pursuant to sections 363 or 364(a) or (b) of the Bankruptcy Code in an amount necessary for the maintenance and preservation of its assets and operation of its business, or secured indebtedness pursuant to section 364(c) of the Bankruptcy Code on terms or from sources other than as provided by Countrywide pursuant to the terms of this Motion.

17.    Good cause exists for the entry of an Order granting the Motion. Among other things, entry of an Order will minimize the disruption of the Debtor's business, will increase the possibility for a successful orderly liquidation of the Debtor, will maintain the value of the Debtor's assets, and is in the best interests of the Debtor, its creditors and other parties-in-interest.

18.    The terms of the use of cash collateral or post-petition financing outlined herein are for reasonably equivalent value and fair consideration.

19.     As security for the contemplated DIP Loan and/or the use of cash collateral, Debtor proposes that Countrywide will be granted (a) pursuant to Section 364(c)(2) of the Bankruptcy Code, a perfected first priority lien on and security interest in all pre-petition and post-petition property of the Debtor that constitutes unencumbered property of the Debtor, including, without limitation, the Debtor's interest in the Over/Under Account (as defined in the Countrywide Agreements), (b) pursuant to Section 364(c)(3) of the Bankruptcy Code, a perfected junior lien on and security interest in all pre-petition and post-petition property of the Debtor subject to valid and perfected liens in existence on the Petition Date or to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code (all property in which Countrywide is to be granted a lien and security interest being referred to as the "DIP Collateral"); except avoidance actions under Chapter 5 of the Bankruptcy Code.  In addition to the grants of security described herein, in either a cash collateral or a borrowing transaction, the Debtor shall be authorized and directed to continue to perform, in the ordinary course of its business operations, all post-petition obligations under all pre-petition agreements with Countrywide necessary to finalize the sale process for loans purchased by Countrywide under the pre-petition agreements of the parties, and to otherwise perform non-economic functions in connection with the Countrywide agreements, from time to time, as necessary, such as fielding customer inquiries and acting as liaison between customers and Countrywide.

20.     In order to adequately protect Countrywide, the Debtor agrees:

(a)     Debtor's obligations to Countrywide under this Motion shall be secured by a valid and perfected first security interest in and lien on all DIP Collateral;

(b)     Countrywide shall be granted an administrative expense claim pursuant to Section 503(b) of the Bankruptcy Code, arising from use of cash collateral or borrowing under § 364 of the Bankruptcy Code.

Generally, the terms, conditions and provisions of the Debtor's and Countrywide's pre-petition loan, promissory note, security agreement and related documents apply to the Debtor's post-petition use of cash collateral and/or borrowing.

21.     As noted, the Debtor seeks either use of cash collateral to pay for the budget items in Exhibit "B" and/or in the alternative, a DIP loan as contemplated in Exhibit "A". To the extent the Court declines to grant the Debtor's use of cash collateral and/or to the extent a DIP loan is unavailable to the Debtor, then the Debtor seeks to surcharge the collateral of Countrywide as to those budgetary items contained in Exhibit "B" that are not approved to be paid through use of cash collateral and/or through a DIP loan. Substantially all, if not all, of the expenses and budget line items in Exhibit "B" will be expended in connection with the preservation, maintenance and disposition of property, assets and collateral that secure the claim of Countrywide. Accordingly, the Court should surcharge the collateral of Countrywide (except as to the funding approved in the Original Funding Order and/or any additional funding that might be approved, on a consensual basis, in connection with the First Amended Motion) for these budgetary items.

22.     <u>Reporting Requirements.</u>

(a)     Debtor shall promptly provide Countrywide and its counsel with copies of all reports made to the Court, all reports or financial data prepared by Debtor's accountants, and all reports and information currently required to be provided by the Debtor to Countrywide, including, without limitation, the reports and

information required by the agreement of the parties, and all such other information as may be reasonably requested by Countrywide.

(b)     Debtor shall continue to permit representatives of Countrywide reasonable access to the books and records of Debtor, all reports or financial data given by Debtor to any other third party, and shall permit reasonable opportunity to meet with and obtain information from responsible personnel of Debtor. Specifically, without limitation, Debtor shall permit Countrywide and its agents reasonable access to Debtor's books and records and business premises for the purpose of winding down the Debtor's business and conducting any audit or other study deemed necessary or appropriate by Countrywide.

(c)     Debtor shall continue to use its best efforts to perform in the ordinary course of its business operations all post-petition obligations to Countrywide necessary to finalize the sale process for loans purchased by Countrywide under the applicable agreements.

23.     <u>Execution of Documents and Automatic Perfection of Liens</u>.  To evidence the obligations, the creation of security interests as set forth above, and all terms and provisions evidencing the agreements between Debtor and Countrywide, the Debtor respectfully requests that it be authorized to execute and deliver to Countrywide, at Countrywide's option, any and all of the following as may be requested or required by Countrywide, in form and substance acceptable to Countrywide.

All agreements, instruments and documents of any type or nature, including, without limitation, factoring agreements, security agreements, financing statements, notes, schedules,

instruments, powers of attorney, consents, assignments, contracts, notices, leases, amendments, supplements and alloinges implementing the Security Agreement and security interests and liens granted in connection therewith, and all other written matter now or from time to time hereafter reasonably requested by Countrywide.

Notwithstanding the foregoing, all agreements, security interests, and liens contemplated by this Motion are effective and perfected without further filing by Countrywide in compliance with any state or federal law. Countrywide will not be required to file financing statements or other documents in any jurisdiction or take any other actions in order to perfect its security interests and liens made or granted under or pursuant to the Motion. If Countrywide, in its sole discretion, chooses to file any financing statements, or other documents to otherwise confirm perfection of such security interests and liens, all such documents shall be deemed to have been filed or recorded at the time and on the Petition Date. However, the failure of Debtor to execute any such documentation, or failure of Countrywide otherwise to attach or perfect its security interest in the Collateral under state or federal law, shall in no way affect the validity, perfection, or priority of the security interests, and liens granted to Countrywide. As a result of these "self executing" provisions as to the terms of any post-petition pending between the Debtor and Countrywide, there is no need to attach copies of any lending documents hereto. Any such documents shall contain the provisions of the Original Funding Order, however, and it is attached as Exhibit "A". However, out of an abundance of caution, the Debtor attaches a proposed Promissory Note from the Debtor to Countrywide that will form the basis of any promissory note transaction that may be entered into by and between the Debtor and Countrywide, and marks the same as Exhibit "C".

## Law and Argument

**A.      Cash Collateral Can Be Used by a Debtor Only with the Consent
of the Lender or an Order of the Court Determining that the Lender
will be Adequately Protected.**

24.      A debtor's use of property of the estate is governed by Bankruptcy Code Section

363. Section 363(c)(1) provides that a debtor in possession may use property of the estate in the

ordinary course of business without notice or a hearing.  11 U.S.C. § 363(c)(1), Section 363(c)(2),

however, permits a debtor in possession to use, sell or lease "cash collateral" under subsection (c)(1)

only if the entity with an interest in the cash collateral consents or the Court authorizes such use.

11 U.S.C. § 363(c)(2).  Whether such use may be authorized by a court depends on whether there

is adequate protection of the entity's interest in the cash collateral.  Section 361 of the Bankruptcy

Code does not provide a definition of adequate protection.  However, it is clear that under case law

considering adequate protection in similar circumstances, Countrywide is adequately protected in

this case.

25.      As noted, the Debtor believes Countrywide holds an interest in certain cash of the

Debtor in the nature of a cash collateral interest.

**B.      Countrywide is Adequately Protected by the Projected Maintenance
of Operations, and Finalizing Sale Process.**

26.      The Bankruptcy Code protects a secured creditor only to the extent that a debtor's use

of the collateral will result in a decrease in "the value of such entity's interest in such property."  11

U.S.C. §§ 361, 363(e); *see United Savs. Ass'n v. Timbers of Inwood Forest Ass'n Ltd.,* 484 U.S. 365,

369-73, 108 S. Ct. 626 (1988) ("Timbers") (Supreme Court holds that the "interest in property"

entitled to protection is "the value of the collateral, as of the time of the commencement of the

bankruptcy case" that secures such claim).  *See also Orix Credit Alliance, Inc. v. Delta Resources,*

*Inc. (In re Delta Resources,* Inc.) 54 F.3d 722, 730 (11th' Cir.). *cert. denied* 116 S. Ct. 488 (1995).

Here, the interests of Countrywide are adequately protected by Countrywide's equity cushion and the

Debtor's agreement to grant Countrywide a continuing security interest and replacement lien in post-

petition assets, cash and related collateral.   The replacement liens will help protect against any

diminution of those interests as a result of the Debtor's use of cash collateral so that sufficient

adequate protection exists to permit the use of cash collateral contemplated by the Debtor.

27.     In addition, Countrywide is adequately protected by the Debtor's orderly wind-down

of its ongoing business, which will preserve the value of the collateral securing the claims of

Countrywide.   If the value of Countrywide's collateral is expected to remain relatively constant,

Countrywide is deemed to be adequately protected without any other form of adequate protection,

*See e.g., Orix Credit Alliance, supra: Westchase I Assoc. L.P. v. Lincoln Nat'l Life Ins. Co.,* 126 B.R.

692, 694 (W.D.N.C. 1991).  *See e.g., In re Dynaco Corp.,* 162 B.R. 389 (Bankr. D.N.H. 1993);

*McCombs Properties VI. Ltd. v. First Texas Sav. Ass 'n (In re McCombs Properties VI. Ltd. ),* 88

B.R. 261, 267 (Bankr. C.D. Cal. 1988).

**C.     Authorizing the Use of Cash Collateral is Necessary to
        Preserve Value Which Will Inure to the Benefit of Countrywide
        and All Other Parties-in-Interest.**

28.     The continuing (but limited) operation of the Debtor's business will help to preserve

the value of the existing assets.   The Debtor should have a reasonable opportunity to conclude loans

in transit.   Generally, courts have focused on the use of cash collateral, or borrowing, in a

reorganization context.   It is well established that a bankruptcy court, where possible, should resolve

issues in favor of reorganization:

> Because the ultimate benefit to be achieved by a successful reorganization inures to
> all the creditors of the estate, a fair opportunity must be given to the Debtors to
> achieve that end.   Thus, while interests of the secured creditor . . . are of concern to

the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.

The first effort of the court must be to insure the value of the collateral will be preserved. Yet, prior to confirmation of a plan of reorganization, the test of that protection is not by the same measurements applied to the treatment of a secured creditor in a proposed plan. In order to encourage the Debtor's efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard.

*MBank Dallas, N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393, 1397-98 (10th Cir. 1987): *accord Dynaco* Corp., 162 B.R. at 395 (Bankr. D.N.H. 1983) (cash collateral motion): *Hoffman v. Portland Bank (In re Hoffman),* 51 B.R. 42, 47 (Bankr. W.D. Ark. 1985) (relief from stay); *In re Heatron, Inc.,* 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980) (cash collateral motion).

29.    Indeed, as the court in *Chrysler Credit Corp. v. Ruggiere (In re George Ruggiere Chrysler-Plymouth, Inc.),* 727 F.2d 1017 (11th Cir. 1984*),* noted:

A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use "cash collateral" in its effort to rebuild. Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

*Id.* at 1019.

30.    Applying the foregoing, courts have often allowed the use of cash collateral where such use would enhance or preserve the debtor's reorganization value. Thus, for example, in *Stein v. United States Farmers Home Administration (In re Stein),* 19 B.R. 458 (Bankr. E.D. Pa. 1982), the court allowed a debtor to use cash collateral where the secured party was unsecured, finding that the use of cash collateral was necessary to the continued operations of the debtor and the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]". *Id.* At 19 B.R. 460; *see also Dynaco,* 162 B.R. at 396 (finding that the alternative to the debtor's use of

cash collateral, a forced termination of its business, would doom reorganization and any chance to maximize value for all creditors): *In re Karl A. Neise, Inc.,* 16 B.R. 600, 602 (Bankr. S.D. Fla. 1981) (marginally secured creditor adequately protected by lien on post-petition property acquired by debtor; the debtor can use cash collateral "in the normal operation of their business").

Here, use of cash collateral enhances the Debtor's orderly liquidation efforts and preserves value and order.

31.     If the Debtor is denied the use of cash collateral, in all likelihood it will be forced to cease all operations.  Such a cessation of operations, even temporarily, would cause the Debtor significant losses with respect to the value of its assets and it would create uncertainty and confusion with respect to the orderly liquidation herein.  It would also likely result in a forced liquidation of all of the Debtor's assets, and a consequent loss to creditors of value.  The Budget represents those payments that are critical needs of the Debtor and the Debtor seeks permission of the Court to pay those critical need claims and creditors immediately from cash collateral or post-petition advances.

**D.     The Debtor is Prepared to Grant Countrywide Liens on Certain Post-petition Assets.**

32.     The Bankruptcy Code expressly provides that granting of a replacement lien constitutes a means of adequate protection. 11 U.S.C. § 361(2).  The granting of replacement liens provides ample adequate protection of Countrywide's interest in cash collateral. *See, e.g., MBank Dallas, N.A. v. O'Connor (In re O'Connor),* 808 F.2d 1393 (10th Cir. 1987); *In re Dixie-Shamrock Oil & Gas, Inc.,* 39 B.R. 115, 118 (Bankr. M.D. Tenn. 1984).

33.     The Debtor is prepared to provide adequate protection to Countrywide in the nature of replacement liens as set forth herein, as to the Debtor's use of cash collateral.  Specifically, Countrywide shall be granted a replacement lien, for the use of cash collateral, upon (i) all assets,

with the exception of Chapter 5 avoidance causes of action under the Bankruptcy Code; (ii) all property acquired by the Debtor after the Petition Date that is of the exact nature, kind or character of pre-petition collateral; and (iii) all cash, notes and account receivables.

34.    In addition, the Debtor will provide Countrywide with information relating to projected revenue and expenses, actual revenue and expenses and variances.  This information will enable Countrywide to monitor its interests in collateral.  Such reporting of financial information has been held to be a form of adequate protection.  *See, e.g., Mutual Benefit Life Ins. Co. v. Stanley Station Assocs., L.P. (In re Stanley Station* Assocs., L.P.), 140 B.R. 806, 809 (D. Kan. 1992) ("In addition, we believe the request by MBL for 'timely filing of proper monthly operating reports . . .' falls within the ambit of adequate protection . . ."); *Sumitomo Trust & Banking Co. v. Holly's. Inc. (In re Holly's, Inc.),* 140 B.R. 643, 706 (Bankr. W.D. Mich. 1992) (reports required as part of adequate protection).

**E.     The Court Should Approve Additional Post-Petition Funding by Countrywide, If Available.**

35.    For all of the above and foregoing reasons, the Court should also approve any additional post-petition financing by Countrywide (the "DIP Loan").  The DIP Loan will allow the Debtor to continue its operations, provide for an orderly liquidation and wind down of certain assets as described herein and provide additional security to Debtor's employees that their salaries will continue to be paid.

36.    The terms and conditions of any DIP Loan will have been negotiated in good faith and at arm's length, and the DIP Loan will be extended in good faith as that term is contemplated in §364(e) of the Bankruptcy Code.

37.    As noted, the terms and conditions of any proposed borrowing by the Debtor from Countrywide will be controlled by the terms hereof as well as being consistent with the provisions

of the Original Funding Order.  In addition, any approved use of cash collateral shall similarly be controlled by the basic terms of the Original Funding Order that is attached as Exhibit "A".

### Notice

38.     Notice of this Motion has been provided to (i) the known relevant secured parties (Countrywide) and  its counsel and the U. S. Trustee, all government agencies, the 20 largest unsecured creditors herein, and all parties having entered an appearance and requested notice.  The Debtor submits that notice is appropriate and proper under the circumstances and that no further notice is required.

### Conclusion

39.     The Debtor respectfully requests that this Court, upon consideration of the Motion, (1) authorize the Debtor's use of cash collateral on an interim basis in accordance with the Budget provided for herein or, alternatively, approve the Debtor's borrowing of sufficient funds from Countrywide in accordance with the provisions provided for herein; (2) schedule a final hearing on this Motion; (3) upon final consideration, authorize the Debtor's use of cash collateral in accordance with the Budget, and (4) grant the Debtor such other and further relief to which it may be entitled.

Respectfully submitted this, the 4th day of March, 2009.

REALTY MORTGAGE CORPORATION

By Its Attorneys,

HARRIS JERNIGAN & GENO, PLLC

By:_____
        Craig M. Geno

OF COUNSEL:

Craig M. Geno; MSB No. 4793
Jeffrey K. Tyree; MSB No. 9049
Melanie T. Vardaman; MSB No. 100392
HARRIS JERNIGAN & GENO, PLLC
587 Highland Colony Parkway (39157)
P. O. Box 3380
Ridgeland, MS 39158-3380
601-427-0048 - Telephone
601-427-0050 - Facsimile
F:\Users\Bankrupt\Realty Mortgage\Pleadings\Cash Collateral\2nd Amended\2nd Amended-Supp Emergency Motion - Cash Collateral.wpd

## CERTIFICATE OF SERVICE

I, Craig M. Geno, do hereby certify that I have caused to be served this date, via electronic filing transmission and/or U. S. Mail, postage prepaid, a true and correct copy of the above and foregoing to the following:

> Ronald H. McAlpin, Esq.
> Ronald.McAlpin@usdoj.gov
>
> Stephen W. Rosenblatt, Esq.
> Steve.Rosenblatt@butlersnow.com
>
> David M. Unseth, Esq.
> dmunseth@BryanCave.com

THIS, the 4th day of March, 2009.

_____
Craig M. Geno

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:
REALTY MORTGAGE CORPORATION                                    CHAPTER 11
        Debtor                                              CASE NO. 09-00544-NPO

# EXHIBIT "A"

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:
**REALTY MORTGAGE CORPORATION,**                           **Chapter 11**
                                                            **Case No. 09-00544**

      Debtor.

## INTERIM ORDER AUTHORIZING DEBTOR TO OBTAIN
## POST-PETITION SECURED FINANCING AND SCHEDULING A FINAL HEARING

This matter came before the Court on the oral motion (the "Motion") of Realty Mortgage

Corporation (the "Debtor") in the above-captioned bankruptcy case (the "Case") for an order: (i)

authorizing the Debtor to obtain post-petition secured financing (the "DIP Loan") from

Countrywide Bank, FSB ("Countrywide") pursuant to 11 U.S.C. §§ 105, 363, 364(c)(1),

364(c)(2) and 364(c)(3), and (ii) scheduling a final hearing on the Motion (the "Final Hearing")

pursuant to Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules").

~~Due notice of the Motion having been given by the Debtor pursuant to Bankruptcy Rule~~

~~4001(c), and~~ upon all of the pleadings filed with the Court, and upon the record in these

proceedings to date and the record made at the interim hearing on the Motion, and after due

deliberation and consideration and sufficient cause appearing therefor;

~~THE COURT HEREBY FINDS AND DETERMINES~~ THAT:

    A.    The Court has core jurisdiction over these proceedings and the parties and

property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. The statutory predicates for

the relief sought herein are Sections 105, 363, 364, 503 and 507 of the Bankruptcy Code and

Bankruptcy Rules 4001(c).

    B.    Countrywide has been the Debtor's major correspondent lender and, prior to the

bankruptcy filing, purchased loans from the Debtor under various agreements, including the

following: (a) Master Repurchase Agreement dated as of March 17, 2008 (as amended and supplemented, the "Repurchase Agreement"); and (b) Loan Purchase Agreement dated January 26, 1995 (as amended and supplemented, the "Loan Purchase Agreement" and, together with the Repurchase Agreement, the "Countrywide Agreements").

C.      On February 17, 2009 (the "Petition Date), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor has retained possession of its property and continues to operate its business as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

D.      An immediate need exists for the Debtor to obtain the DIP Loan in order to enable the Debtor to minimize disruption and to avoid termination of its business operations.

E.      Pursuant to Sections 364(a) and (b) of the Bankruptcy Code, the Debtor has been unable to obtain unsecured credit or secured credit allowable under Section 503(b)(1) of the Bankruptcy Code. The terms and conditions of the DIP Loan have been negotiated in good faith and at arms' length, and the DIP Loan is being extended in good faith, as that term is used in Section 364(e) of the Bankruptcy Code.

F.      In order to prevent immediate and irreparable harm to the estate of the Debtor pending the Final Hearing, the Debtor requires the DIP Loan to pay the expenses in the amounts set forth in the Budget attached hereto as Exhibit A (the "Budget") through the conclusion of the Final Hearing. _at such C.J.S._

_Based on the record presented to the Court by the Debtor, it appears that_

☒      Under the circumstances of the Case, the terms and conditions of this Order are a fair and reasonable response to the Debtor's request for the DIP Loan, and the entry of this Order is in the best interests of the Debtor's estate and its creditors.

H. *The notice provided by the Debtor of the Motion, the interim hearing on the* *Motion, and the entry of this Order satisfy the requirements of Bankruptcy Rule 4001 and were otherwise sufficient and appropriate under the circumstances.*

*[handwritten:] The Debtor has satisfied the requirements of Rule 4001(c)(2). Cd sub C.J.S.*

## WHEREFORE, THE COURT HEREBY ORDERS THAT:

1. The Debtor is authorized and empowered to use the proceeds of the DIP Loan solely in accordance with and pursuant to the terms and provisions of this Order.

2. Countrywide is authorized to provide the DIP Loan to the Debtor up to the amount set forth in the Budget, nunc pro tunc to the Petition Date, and the Debtor is authorized to use the proceeds of the DIP Loan solely for payment of the expenses set forth in the Budget.

3. The Debtor is expressly authorized and directed to execute and deliver to Countrywide a promissory note for the DIP Loan that contains terms and conditions consistent with this Order and provides, among other things, for payment of interest on all borrowings under the DIP Loan at the rate of prime plus 3%. The Debtor is also expressly authorized and directed to execute and deliver to Countrywide loan agreements, financing statements, mortgages, deeds of trust and other documents and instruments as Countrywide may deem necessary or desirable from time to time, and all such instruments and documents shall constitute valid and binding obligations of the Debtor and shall be enforceable against the Debtor in accordance with their terms.

4. For the DIP Loan, Countrywide is granted, pursuant to Section 364(c)(1) of the Bankruptcy Code, an allowed claim having priority over any and all administrative expenses of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(a), 507(a), 507(b), 547(c), 726 (to the extent permitted by law) and 1112 of the Bankruptcy Code.

5.    As security for the DIP Loan, Countrywide is hereby granted (a) pursuant to

Section 364(c)(2) of the Bankruptcy Code, a perfected first priority lien on and security interest

in all pre-petition and post-petition property of the Debtor that constitutes unencumbered

property of the Debtor, including, without limitation, the Debtor's interest in the Over/Under

Account (as defined in the Countrywide Agreements), (b) pursuant to Section 364(c)(3) of the

Bankruptcy Code, a perfected junior lien on and security interest in all pre-petition and post-

petition property of the Debtor subject to valid and perfected liens in existence on the Petition

Date or to valid liens in existence on the Petition Date that are perfected subsequent to the

Petition Date as permitted by Section 546(b) of the Bankruptcy Code (all property in which

Countrywide is herein granted a lien and security interest being referred to as the "DIP

Collateral"); except Avoidance Actions under Chapter 5 of w/sur/
C.J.S.
to Bankruptcy Code;

6.    Countrywide shall not be required to file or record financing statements,

mortgages, deeds of trust, notices of lien or similar instruments in any jurisdiction or take any

other action in order to validate and perfect the security interests and liens granted pursuant to

this Order.  If Countrywide shall, in its business judgment, choose to file such financing

statements, mortgages, deeds of trust, notices of lien or similar instruments or otherwise confirm

perfection of such security interests and liens, all such documents shall be deemed to have been

filed and recorded as of the Petition Date, but subject in all respects to the priorities set forth in

this Order.  [, but subject to 5 days business notice, w/ sur/
C.J.S.

7.    On the earliest of (i) March 13, 2009, unless the Court has entered an order

extending the Interim Order prior to such date; (ii) at Countrywide's election, 30 days after the

entry of the Interim Order if a final order approving the Motion (the  "Final Order") has not been

entered prior to the expiration of such 30-day period; (iii) at Countrywide's election, the date of

the Final Hearing if this Order is modified at the Final Hearing in a manner unacceptable to

Countrywide, and (iv) the date of the occurrence of a default or an event of default under the

Countrywide Agreements based solely upon the refusal or inability of the Debtor to complete the

sale process for loans purchased by Countrywide under the Countrywide Agreements (such date,

the "Termination Date"), (a) the DIP Loan shall be terminated and shall be immediately due and

payable; and (b) Countrywide shall have immediate and automatic relief from the stay with

respect to the DIP Collateral (without regard to the passage of time provided for in Rule

4001(a)(3) of the Federal Rules of Bankruptcy Procedure) to apply any cash in Countrywide's

possession or control to, or to set off any obligations owing by Countrywide to the Debtor

against, the DIP Loan until the DIP Loan is indefeasibly and finally paid in full, which shall

include, without limitation, application and/or setoff of amounts in the Over/Under Account. On

the third Business Day after the Termination Date, at Countrywide's election and without further

notice or order of the Court: (x) Countrywide shall and shall be entitled to exercise all other

rights and remedies available to it with respect to the DIP Collateral; and (y) the Debtor shall be

authorized and directed to take such actions as Countrywide may deem necessary from time to

time to assist Countrywide in the exercise of the rights and remedies available to Countrywide,

including, without limitation, the surrender of the DIP Collateral to Countrywide.

8.      Unless extended by the Court upon the written agreement of Countrywide, this

Order, the Debtor's authorization to use the DIP Loan and Countrywide's obligation to provide

the DIP Loan shall all immediately terminate on the Termination Date.

9.      All fees, costs, expenses, disbursements and advances made or incurred by

Countrywide under or in connection with the DIP Loan, including, without limitation, the actual

and reasonable fees, expenses and disbursements of counsel to Countrywide, shall be added to and made part of the DIP Loan.

10.    The Debtor is hereby authorized and directed to (a) promptly provide to Countrywide and its counsel weekly reports of all postpetition disbursements and payments made by the Debtor, copies of all reports made to the Court, copies of all reports or financial data prepared by Debtor's accountants, and copies of all reports, information, documents and other items currently required to be provided by the Debtor to Countrywide, including under the Countrywide Agreements, and (b) permit representatives of Countrywide reasonable access to the books and records of the Debtor, all reports or financial data given by Debtor to any other third party, and permit reasonable opportunity to meet with and obtain information from responsible personnel of the Debtor.

11.    Pursuant to Section 363(c) of the Bankruptcy Code, the Debtor is hereby authorized and directed to continue to perform, in the ordinary course of its business operations, all postpetition obligations under the Countrywide Agreements necessary to finalize the sale process for loans purchased by Countrywide under the Countrywide Agreements.

12.    Except as otherwise agreed in writing by Countrywide, no order shall be entered in the Case authorizing or directing the Debtor to perform any of the following (and the Debtor shall not perform any of the following): (a) create or permit to exist any liens or encumbrances on the DIP Collateral; (b) create or permit to exist any other superpriority status claims that are pari passu with or senior to the claims of Countrywide; and (c) create or permit to exist indebtedness for borrowed money other than as provided in the Budget.

13.    With respect to the DIP Loan, and subject to entry of the Final Order, the provisions of Section 506(c) of the Bankruptcy Code shall not (either before, on or after the

Termination Date) be imposed upon Countrywide or any of the DIP Collateral for the benefit of

any of the Debtor (or its professionals), any committee (or its professionals), any creditor, or any

trustee, responsible officer or examiner with enlarged powers relating to the operation of the

business of the Debtor (powers beyond those set forth in Section 1106(a)(3) and (4) of the

Bankruptcy Code) appointed or elected in the Case.

14.     To the extent there exists any conflict between the Motion and the terms of this

Order, this Order shall govern and control.

15.     In determining to make the DIP Loan or in exercising any rights or remedies as

and when permitted pursuant to this Order, Countrywide shall not be deemed to be in control of

the operations of the Debtor or to be acting as a "responsible person" or "owner or operator"

with respect to the operation or management of the Debtor (as such terms, or any similar terms,

are used in the United States Comprehensive Environmental Response, Compensation and

Liability Act, 29 U.S.C. §§ 9601 et seq. as amended, or any similar federal or state statute).

Countrywide shall not be obligated to provide financing or any other financial accommodations

to the Debtor except upon the terms and conditions contained in this Order.

16.     A hearing to determine whether to extend this Order pending the Final Hearing is

scheduled for March 12 , 2009, and may be continued from time to time. *at 1:30 o'clock pm w/ out C.J.S.* The Final Hearing is

scheduled for March 23 , 2009, and may be continued from time to time. *at 1:30 o'clock pm w/ out C.J.S.* The Debtor is directed

to immediately serve a copy of this Order (or cause it to be served) by first-class U.S. mail,

postage prepaid, on Countrywide, the Debtor's other secured creditors, the Debtor's twenty

largest unsecured creditors and the United States Trustee, which service shall constitute adequate

and proper notice of the Final Hearing.  Any objection to this Order must, no later than three

Business Days prior to the date of the Final Hearing, be filed with the Court and received by

counsel for the Debtor, Countrywide and the United States Trustee. Any timely and properly

filed and served objection will be heard by the Court at the Final Hearing.


Date: _February 27_, 2009


_____
UNITED STATES BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:                                                    CHAPTER 11
REALTY MORTGAGE CORPORATION              CASE NO. 09-00544-NPO
         Debtor

# EXHIBIT "A"

# Realty Mortgage Corporation
# Budgeted Expenses

| Description | Week 1 | Week 2 |
|---|---|---|
| Salary and Wages | 23,150 | 23,150 |
| Commission | | |
| Employee Benefits | | |
| Employee Bonus | | |
| Contract Labor | 1,000 | 1,000 |
| Outside Services | | |
| Rent Expense-Flowood | | |
| Rent Expense-Grand Prairie | | |
| Rent Expense-Brentwood | | |
| Rent Expense-Northfield | | |
| Rent Expense-Clarksville | | |
| Rent Expense-Hendersonville | | |
| Rent Expense-Murfreesboro | | |
| Rent Expense-Knoxville | | |
| Rent Expense-California | | |
| Rent Expense-Albuquerque | | |
| Rent Expense-Atlanta | | |
| Storage | | |
| License and Permits | | |
| Office Expense | 3,000 | 3,000 |
| Office Supplies | 1,000 | 1,000 |
| Accounting | | |
| LEGAL FEES | | |
| Professional fees | | |
| Postage & Freight | 1,000 | 1,000 |
| Equipment rental | | |
| Repair and Maintenance | 350 | |
| COPIER MAINTENENCE | 1,500 | |
| Utilities | 1,000 | |
| Internet Service | | |
| WEB SITE HOSTING | | |
| Telephone - Local | 1,250 | - |
| Telephone - Long Distance | 2,442 | - |
| Life and Health Insurance | 11,025 | |
| Workers Comp | | |
| Property and Liability Insurance | | |
| Interest Expense | | |
| Payroll Tax Expense | 1,836 | 1,836 |
| Unemployment Tax Expense | 816 | 816 |
| Real Estate Tax | | |
| Other tax | | |
| Travel | 500 | |
| Travel - Car Rental | 300 | |
| Travel - Other | | |
| Meals and Entertainment | 200 | |
| Computer Software expense | | |
| Software Maintenance Expense | | |
| Computer Support / Consultants | | |
| Computer Supplies | | |
| **Total Budgeted Expenses** | 50,369 | 31,802 |

Proposed 2-week budget

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:
REALTY MORTGAGE CORPORATION                          CHAPTER 11
            Debtor                          CASE NO. 09-00544-NPO

# EXHIBIT "B"

# Realty Mortgage Corporation
## Budgeted Expenses

| Description | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 |
|---|---|---|---|---|---|---|---|
| Salary and Wages | 23,150 | 23,150 | 23,150 | 23,150 | 28,515 | 12,859 | 12,859 |
| Commission | | | | | | | |
| Employee Benefits | | | | | | | |
| Employee Bonus | | | | | | | |
| Contract Labor | 1,000 | 1,000 | 1,000 | 500 | 850 | 850 | 500 |
| Outside Services | | | | | 3,105 | | |
| Rent Expense-Flowood | | | | | 9,822 | 27,500 | |
| Rent Expense-Grand Prairie | | | | | | | |
| Rent Expense-Brentwood | | | | | | | |
| Rent Expense-Northfield | | | | | | | |
| Rent Expense-Clarksville | | | | | | | |
| Rent Expense-Hendersonville | | | | | | | |
| Rent Expense-Murfreesboro | | | | | | | |
| Rent Expense-Knoxville | | | | | | | |
| Rent Expense-California | | | | | | | |
| Rent Expense-Albuquerque | | | | | | | |
| Rent Expense-Atlanta | | | | | 895 | 2,505 | |
| Storage | | | | | | | |
| License and Permits | | | | | | | |
| Office Expense | 3,000 | 3,000 | 1,000 | 1,000 | 500 | 500 | 5,000 |
| Office Supplies | 1,000 | 1,000 | 1,000 | 1,000 | 500 | 500 | 500 |
| Accounting | | | | | | | |
| LEGAL FEES | | | | | | | |
| Professional fees | | | | | | | |
| Postage & Freight | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Equipment rental | | | | 1,000 | 1,631 | | |
| Repair and Maintenance | 350 | | | 350 | 305 | | |
| COPIER MAINTENANCE | 1,500 | | | 250 | | | 250 |
| Utilities | 1,000 | | | 3,500 | 2,045 | | 800 |
| Internet Service | | | | 1,700 | 1,670 | | |
| WEB SITE HOSTING | | | 500 | | | | |
| Telephone - Local | 1,250 | | | 1,250 | 2,582 | | |
| Telephone - Long Distance | 2,442 | - | - | 2,442 | 1,314 | | |
| Life and Health Insurance | 11,025 | | | | 5,000 | | |
| Workers Comp | | | | | 12,759 | | |
| Property and Liability Insurance | | | | | 13,728 | | |
| Interest Expense | | | | | | | |
| Payroll Tax Expense | 1,836 | 1,836 | 1,836 | 1,836 | 2,181 | 984 | 984 |
| Unemployment Tax Expense | 816 | 816 | 816 | 816 | 998 | 450 | 450 |
| Real Estate Tax | | | | | | | |
| Other tax | | | | | | | |
| Travel | 500 | | | 500 | | 500 | |
| Travel - Car Rental | 300 | | | 300 | | 300 | |
| Travel - Other | | | | | | | |
| Meals and Entertainment | 200 | | | 200 | | 200 | |
| Computer Software expense | | | | | | | |
| Software Maintenance Expense | | | 754 | | | | |
| Computer Support / Consultants | | | 2,000 | 2,000 | 1,125 | 900 | 750 |
| Computer Supplies | | | | | | | |
| U. S. Trustee Fees | | | | | | | 10,000 |
| **Total Budgeted Expenses** | **50,369** | **31,802** | **33,056** | **42,794** | **90,525** | **49,048** | **33,093** |

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**

IN RE:
**REALTY MORTGAGE CORPORATION**
       **Debtor**

**CHAPTER 11
CASE NO. 09-00544-NPO**

# EXHIBIT "C"

# PROMISSORY NOTE

$82,171                                                   February 27, 2009

FOR VALUE RECEIVED, REALTY MORTGAGE CORPORATION, a Mississippi corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code ("Borrower"), does hereby promise to pay to the order of COUNTRYWIDE BANK, FSB ("Lender"), at the office of Lender or at such other place as may be designated in writing by the holder hereof, in lawful money of the United States of America in immediately available funds, EIGHTY TWO THOUSAND ONE HUNDRED SEVENTY-ONE DOLLARS ($82,171) (the "Maximum DIP Loan Amount") or the aggregate unpaid principal amount of the DIP Loan (as defined in the Interim DIP Order hereafter defined) advanced by Lender to Borrower, whichever is less, on the Termination Date (as defined in the Interim DIP Order) or such earlier date or dates and in such amounts as are required by the Interim DIP Order, and to pay interest on the unpaid principal amount from time to time outstanding hereunder and such other fees and expenses payable hereunder.

This Note is issued pursuant to that certain Interim Order Authorizing Debtor to Obtain Post-Petition Secured Financing and Scheduling and Final Hearing entered February 27, 2009 (the "Interim DIP Order") by the United States Bankruptcy Court for the Southern District of Mississippi in Borrower's Chapter 11 bankruptcy case, Case No. 09-00544. This Note is secured pursuant to the Interim DIP Order, which security is evidenced by the Interim DIP Order and may now or hereafter be further evidenced by one or more financing statements, mortgages, deeds of trust, notices of lien or similar instruments.

Subject to the terms and conditions contained in the Interim DIP Order and herein, Lender agrees to make advances to Borrower from time to time during the period commencing on the date of this Note and ending on the Termination Date in an aggregate principal amount at any time outstanding not to exceed the Maximum DIP Loan Amount. Borrower agrees that it will only use the proceeds of any such advances in compliance with the terms and provisions as set forth in the Interim DIP Order and this Note.

This Note shall bear interest on the from time to time aggregate unpaid principal amount hereof at a rate per annum equal to the prime rate reported in the Wall Street Journal (or the average prime rate if a high and a low prime rate are therein reported) (the "Prime Rate") plus three percent (3%), such interest rate to change simultaneously with each change in the Prime Rate, interest hereon to be calculated on the basis of the actual number of days elapsed over a year of 360 days. Borrower agrees to pay all fees, costs, expenses, disbursements and advances made or incurred by Lender under or in connection with the DIP Loan, including, without limitation, the actual and reasonable fees, expenses and disbursements of counsel to Lender, all of which shall be added to and made part of the DIP Loan.

Except as provided in the Interim DIP Order, Borrower waives any right to demand for payment, presentment, any requirement for protest or notice of protest or dishonor or non-payment, and any other rights to notice or demands with respect to this Note. This Note shall be governed by, and construed in accordance with, the law of the State of California applicable to contracts made and to be performed wholly within such state and the Bankruptcy Code.

IN WITNESS WHEREOF, Borrower has executed this Note effective as of the date first above written.

**REALTY MORTGAGE CORPORATION**

By: _____

Title: _____